IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARITZA TORO, | ) | CASE NO. 1:15 CV 2220 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## Introduction

Before me[1] is an action by Maritza Toro under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.[2] The Commissioner has answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and

---

[1] ECF # 14. The parties have consented to my exercise of jurisdiction.

[2] ECF # 1.

[3] ECF # 10.

[4] ECF # 11.

[5] ECF # 6.

procedural[6] orders, the parties have briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9] They have participated in a telephonic oral argument.[10]

## Facts

**A.    Background facts and decision of the Administrative Law Judge ("ALJ")**

Toro who was 48 years old at the time of the administrative hearing,[11] did not graduate from high school and has not earned a general equivalency diploma (GED).[12]  She is not married and lives with her mother and two adult daughters.[13] Her past relevant employment includes fast food cashier and daycare provider.[14]

The ALJ, whose decision became the final decision of the Commissioner, found that Toro had the following severe impairments: cervical degenerative disc disease with

---

[6] ECF # 13.

[7] ECF # 27 (Commissioner's brief); ECF # 20 (Toro's brief).

[8] ECF # 27-1 (Commissioner's charts); ECF # 20-1 (Toro's charts).

[9] ECF # 19 (Toro's fact sheet).

[10] ECF # 29.

[11] ECF #19 at 1.

[12] *Id.*

[13] ECF # 11, Transcript ("Tr.") at 45.

[14] *Id.* at 27.

radiculopathy, status post C5-6 discectomy and fusion; asthma; obesity; and major depressive disorder (20 C.F.R §404.1520 (c) and §416.920 (c)).[15]

After concluding that the relevant impairments did not meet or equal a listing, the ALJ made the following finding regarding Toro's residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant retains the residual functional capacity to perform light work as defined in 20 C.F.R §404.1567(b) and §416.967(b), except she can no more than frequently stoop, kneel, crouch, or climb ramps or stairs; she can no more than frequently handle or finger with the left, non-dominant upper extremity; she can no more than occasionally crawl; she can no more than occasionally push/pull or reach overhead with the left, non-dominant upper extremity; she can never climb ladders, ropes or scaffolds; she should avoid all exposure to hazards, such as unprotected heights, dangerous machinery; she should avoid concentrated exposure to respiratory irritants, such as fumes, odors, dust, gases, and poor ventilation; and she can perform simple to moderately complex tasks with no fast-paced work, no strict production quotas, and no more than minimal changes in the work setting.[16]

Given that residual functional capacity, the ALJ found Toro incapable of performing her past relevant work as fast food cashier and daycare provider.[17] Applying the medical-vocational grids in Appendix 2 of the regulations, the ALJ found Toro not under a disability.[18]

Based on an answer to a hypothetical question posed to the vocational expert at the hearing setting forth the residual functional capacity finding quoted above, the ALJ

---

[15] *Id*. at 19.

[16] *Id.* at 22.

[17] *Id*. at 27.

[18] *Id*. at 28.

determined that a significant number of jobs existed locally and nationally that Toro could perform.[19]

## B. Issues on judicial review

Toro asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Toro presents the following issues for judicial review:

- Whether the ALJ erred in his analysis of the plaintiff's pain complaints.[20]

- Whether the ALJ erred in not giving a RFC report of plaintiff's physician, who worked in the same office as plaintiff's treating physician, proper weight.[21]

- Whether the ALJ erred in not considering plaintiff's combined impairments in the RFC assigned to plaintiff.[22]

For the reasons that follow, I will conclude that the ALJ's finding of no disability is supported by substantial evidence and, therefore, must be affirmed.

---

[19] *Id.*

[20] ECF # 20 at 1.

[21] *Id.*

[22] *Id.*

-4-

## Analysis

**A.	Standards of review**

*1.	Substantial evidence*

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "
>
> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[23]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner

---

[23] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

survives "a directed verdict" and wins.[24] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[25]

I will review the findings of the ALJ at issue here consistent with that deferential standard.

**B. Application of standards**

This case essentially involves a challenge to the RFC on three grounds:

- a claimed failure to properly analyze Toro's credibility;

- a purported error in weighing the opinion of an allegedly treating source; and

- an asserted error in not considering the combination of mental and physical limitations in fashioning the RFC.[26]

*1. Credibility*

Toro contends that the ALJ failed to assess her complaints of pain in conformity with the applicable standards.[27] To that point, Toro notes that the ALJ found that her ability to care for her elderly mother undermines her credibility as to disabling pain.[28] But, she asserts, this finding is not supported by the facts, which, she argues, show only that she "keeps an

---

[24] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06CV403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[25] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

[26] ECF # 20 at 1.

[27] *Id*. at 10.

[28] *Id*. at 11 (citing transcript at 24).

-6-

eye" on her mother while an aide performs the other duties.[29] Further, she claims that the "presumption" that she provides substantial care to her mother "ignores the reality" of how any "occasional activities" by her in this context could translate into an ability to be employed at a full-time job.[30]

Toro also argues that the ALJ failed to properly consider the objective medical evidence that she claims support her complaints of on-going pain, such as an MRI of her cervical spine which led to a 2011 surgery and the post-operative findings.[31] She also points to elements of the record detailing her use of medications for pain, and her participation in physical therapy.[32]

In addressing Toro's claims concerning the severity of her limitations, the ALJ here provided an unusually thorough and detailed analysis of those claims, complete with numerous specific, supporting citations to the record, which analysis extends over almost two full pages of the opinion.[33] While obviously the ALJ's work in this regard is not judged simply by the number of pages employed in its presentation, in the manner of a grade school book report, I make this preliminary observation to emphasize the context of diligence within which my judicial review takes place.

---

[29] *Id*. at 11 (citing transcript at 61).

[30] *Id*. at 11.

[31] *Id*. at 12-13 (citing transcript at 299-300, 327, 436-37).

[32] *Id*. at 13 (citing transcript at 50, 377, 709).

[33] Tr. at 23-25.

That said, it is immediately apparent that while Toro may disagree with the conclusions drawn from the medical evidence by the ALJ as regards her subjective complaints, there is no dispute that the medical evidence was extensively considered in this regard by the ALJ, as is required by the regulations.[34] In that regard, the ALJ specifically discussed a post-surgical X-ray study, a post-surgical MRI, and additional X-rays of Toro's right knee and lumbar spine, all of which revealed either good results, or mostly mild to moderate difficulties.[35] The ALJ then noted some fifteen separate mental or physical examinations which disclosed some level of impairment[36] before detailing the results of 62 separate mental and physical examinations which resulted in mostly normal or unremarkable findings that were inconsistent with Toro's allegations of pain.[37]

In addition to reviewing the objective medical evidence as discussed above, the ALJ then proceeded to review the treatments Toro received for any of her acknowledged medical problems.[38] In this review, the ALJ considered evidence which, *inter alia*, showed that:

- Toro's surgeon considered her spinal fusion a success, and released her to return to work;

---

[34] *See*, SSR 96-7p; 20 C.F.R. § 404. 1529 c.

[35] Tr. at 23 (citing transcript). Only the post-surgical MRI of 2012 showed "severe" neoroforaminal stenosis at the C5-C6 level. *Id*. (citing transcript).

[36] *Id*. at 23 (citing transcript).

[37] *Id*. at 23-24 (citing transcript).

[38] *Id*. at 24 (citing transcript).

- Toro declined to receive epidural steroid injections for pain, despite the fact that they are "essential diagnostic tools for evaluating radiculopathy;"

- Toro "only occasionally" received narcotic painkillers, and then only from her primary care physician, while the pain management specialist prescribed only anti-inflammatory medication;

- Toro did not avail herself of multiple conservative therapies, such as aquatic exercise and smoking cessation, as suggested by the pain management specialist.[39]

With this evidentiary basis, the ALJ concluded that the treatments Toro has sought and received is not what one would expect in the case of a person disabled by the level of pain claimed by Toro.[40]

Finally, and in the area most disputed here, the ALJ reviewed Toro's daily activities and found that they reflect a "greater physical and mental functional ability than she alleges."[41] It is here, among a list of activities that includes Toro being independent in caring for herself and also caring for her young adult daughter with cerebral palsy, that the ALJ further noted that Toro provides care for her elderly mother who is confined to a wheelchair as the result of a stroke.[42]

In this respect, Torro correctly observes that ALJs must be very cautious in determining that actions done periodically in the course of daily personal life are fully

---

[39] *Id*.

[40] *Id*.

[41] *Id.*

[42] *Id*. at 24-25.

indicative of a claimant's capacity to do full-time work in the economy.[43] But, as the Commissioner notes, the single reference to Toro's care for her mother was within the context of a more extensive examination of all of her daily activities, which itself was only one element of the wider review of all the evidence - medical and testimonial - that was considered as part of the determination of whether Toro's subjective complaints of disabling pain were supported by the other evidence.

Therefore, in light of the controlling rubrics and considering that Toro's care for her mother was in no way the decisive factor in the ALJ's extensive and well-supported analysis of Toro's credibility, I find no error in that analysis.

## 2. Dr. Shah

Toro contends here that the ALJ erred by not giving substantial weight to a functional capacity opinion from Dr. Jamil Shah, M.D.[44] To that point, she contends that although she actually only saw Dr. Shah once - and then only for the purpose of obtaining a functional capacity opinion - nevertheless Dr. Shah's opinion should be viewed as "the closest evidence to a treating physician report" because Dr. Shah is in the same practice as her treating physician and it was too difficult to obtain a timely appointment with her treating doctor for that same purpose.[45]

---

[43] ECF # 20 at 13 (quoting *Lorman v. Comm. of Soc. Sec.*, 107 F. Supp. 3d 829 (S.D. Ohio 2015)(*citing* Rogers, 486 F. 3d at 248).

[44] ECF # 15 at 14.

[45] ECF # 20 at 14-15.

In this regard, Toro cites to regulations and cases approving of the use of functional opinions from otherwise unacceptable medical sources such as nurse practitioners and physician assistant who practice in managed care environments.[46] I have had the opportunity to recently discuss the problems that may arise when patients receive treatment from a medical team led by a physician but which also includes other professionals such as counselors, therapists and nurse practitioners. In those circumstances, courts recognize that a functional opinion prepared by a non-physician member of the treatment team but later signed by the physician, is considered to be the view of the physician as an acceptable treating source, in that he is deemed to have "adopted" as his own a report that may have been prepared by an otherwise non-acceptable source.[47]

Of course, the key in that reasoning is that a physician who himself qualifies as a treating source - *i.e.*, one who has an established treating relationship with the patient - may adopt or ratify an opinion originally prepared by another source.  Here, there is no indication that Dr. Khalid Elamin, M.D., Toro's treating physician, reviewed, ratified, adopted or even knew about the functional opinion of Dr. Shah.  As such, the opinion cannot be viewed as his. Instead, the record is plain that Dr. Shah saw Toro only once, and then solely for the

---

[46] *Id*. at 16-17 (citing SSR 06-*03p; *Craddock v. Colvin*, No. 1:14 CV 01328, 2015 WL 4664006 (N.D. Ohio Aug. 6, 2015)).

[47] *Mitchell v. Comm'r of Soc. Sec*., No. 5:15 CV 974, 2016 WL 4507791, at * 6 (N.D. Ohio Aug. 29, 2016)(citation omitted).

-11-

express purpose of having him prepare a functional capacity assessment in support of her application for benefits.[48]

The Sixth Circuit authority is clear that, in general, a single visit to a doctor is insufficient to establish a treating relationship, absent any different result dictated by the protocols of a particular specialty.[49] In a situation, like here, where the single visit was for the purpose of obtaining a functional capacity opinion, the Sixth Circuit in *Smith v. Commissioner of Social Security* has definitively found that such a visit does not make the resulting opinion the report of a treating source.[50] Moreover, *Smith* teaches that "in the absence of treating source status for these doctors [who give functional opinions after a single visit], we do not reach the question of whether the ALJ violated *Wilson* by failing to give good reasons for not accepting their reports."[51]

---

[48] Tr. at 793.

[49] *Shy v. Comm'r of Soc. Sec.,* No. 1:14 CV 2544, 2016 WL 775299, at ** 6-7 (N.D. Ohio Feb. 29, 2016)(citations omitted); *see also*, *Adcox v. Colvin,* No. 3:15 CV 236-PLR-CCS, 2016 WL 4991597, at * 13 (E.D. Tenn. Aug. 22, 2016)(despite a prior long-term treating relationship, the fact that physician had provided no treatment during or around the relevant time period other than a single office visit meant that there was no "longitudinal view" of claimant's functional capacity as would entitle that physician's functional opinion to controlling weight).

[50] *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)(citations omitted); *accord*, *Hackle v. Comm'r or Soc. Sec.,* No. 1:12 CV 145, 2013 WL 618630, at * 7 (S.D. Ohio Feb. 19, 2013)(physician who examined claimant "only once before giving an RFC assessment" had not "demonstrate[d] the type of ongoing treatment relationship the Social Security regulations envision for treating physician status").

[51] *Smith*, 482 F.3d at 876.

Accordingly, for the reasons stated, I need not address the issue of whether the ALJ analyzed Dr. Shah's opinion in conformity with the treating source rubric. Rather, in the situation, as here, where the opinion at issue is from an acceptable examining medical source who is not a treating source, the Sixth Circuit in *Ealy*[52] states that in general an opinion from an examining source will receive more weight than an opinion from a non-examining source,[53] and that the weight ultimately assigned to the opinion of the examining source should reflect consideration of factors such as "the length and nature of the treatment relationship, the evidence the physician offered in support of the opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty."[54]

In the present case, the ALJ precisely and thoroughly followed the analytical template that is required for an evaluation of Dr. Shah's opinion. The ALJ expressly noted that:

- the examination was the only time Dr. Shah had examined Torro, and the examination was solely "to complete the [residual functional capacity] form" in the absence of Torro's regular primary care physician;

---

[52] *Ealy v. Comm'r of Soc. Sec.,* 594 F. 3d 504 (6th Cir. 2010).

[53] *Id.* at 514 (citations omitted).

[54] *Id.* (citing 20 C.F.R. 404.1527(d)). This analysis is essentially the second distinct level of a treating source analysis, and it comes only after first ascertaining if the opinion of a treating source should not receive controlling weight. That first analysis, with its own standards, is separate from that for assigning weight, and only that first analysis further requires that a negative conclusion be supported by "good reasons." *See, e.g., Albelo v. Comm'r of Soc. Sec.*, No. 1:12 CV 2590, 2014 WL 1093130 at ** 3-4 (N.D. Ohio Mar. 17, 2014)(citation omitted).

- the examination was "cursory," and yielded findings that Torro "had normal strength in all extremities, had no spinal or paraspinal tenderness, reported intact sensation in all extremities, and was able to ambulate without assistance, albeit with short steps and a slight limp;"

- these "minimal clinical findings" are "inconsistent" with the opinion statements that, *inter alia*, Torro could stand or walk for only 30 minutes in an eight hour work day and that her pain would interfere with concentration causing her to be off task and absent from work;

- thus, Dr. Shah's opinion was given "little weight" because the limitations in his opinion are "out of proportion with the clinical findings he documented," as well as with Torro's activities of daily living.[55]

For the above reasons, I find no error with the ALJ's handling of Dr. Shah's opinion.

### *3. Combination of impairments*

Finally, Torro argues that the ALJ erred in not fully considering the combined effects of her impairments.[56] Specifically, she maintains that although the ALJ did address her mental health issues in the decision, he "only included minimal restrictions" within the RFC.[57] In this case, she asserts, it is "the overlapping, combined effects" of her conditions that produce her "symptoms and impairments."[58]

---

[55] Tr. at 25 (citing record).

[56] ECF # 20 at 19.

[57] *Id*.

[58] *Id*.

-14-

Toro points to her mental health issues in particular as "further complicat[ing] her ability to maintain gainful employment." [59] In this regard, she cites to evidence that she has only a 10th grade education, that she suffers from Major Depressive Disorder and has a GAF score, and that after her surgery she isolated herself, no longer desired to drive, and appeared lethargic.[60] She also points to a report from her social worker which notes that Toro seemed depressed and irritable.[61] Finally, she observes that her own testimony was that her depression causes her to become bedridden for up to an hour at a time approximately three times a week.[62]

With these restrictions, she contends that it "would be unreasonable to assume" that she could work on a regular basis without regular interruptions due to he "ongoing issues with mental health."[63]

The ALJ here expressly identified major depressive disorder as a severe impairment at Step 2.[64] At Step 3 he further analyzed, *inter alia*, whether that mental impairment meets or equals a listing.[65] Here, the ALJ considered whether Toro's mental health impairment

---

[59] *Id*. at 20.

[60] *Id*. (citing record).

[61] *Id*. (citing record).

[62] *Id*. (citing record).

[63] *Id.* at 21.

[64] Tr. at 19.

[65] *Id*. at 20.

limited her ability to function in the four categories set out in Section 12.00 C of the Listing.[66] While being careful to note that the analysis for the severity of symptoms at Steps 2 and 3 is not the same or as detailed as the analysis for residual functional capacity done at Steps 4 and 5,[67] the ALJ nevertheless found that Toro's mental health impairment results in only mild restrictions in the range of her activities of daily living and in social functioning, and in moderate difficulty in maintaining concentration, persistence and pace, and further has not produced any extended episodes of decompensation.[68]

In the more detailed analysis at Step 4, which has been discussed earlier, the ALJ expressly set forth Toro's own testimony about how her depression effects her ability to complete tasks, handle stress, go out alone and concentrate.[69] He then found that although her impairments could reasonably be expected to cause these symptoms, Toro's claims in this regard were not credible[70] because of the objective medical evidence,[71] the treatment she has received[72] and her own testimony as to activities of daily living.[73]

---

[66] *Id*.

[67] *Id*. at 22.

[68] *Id*. at 21.

[69] *Id*. at 23.

[70] *Id*. at 23.

[71] *Id*.

[72] *Id*. at 24.

[73] *Id*. at 24-25.

The ALJ further reviewed the functional capacity opinions in some detail, specifically finding "some" merit in the report of consulting psychologist Kathleen Payne, Ph.D., who "indicated that [Toto] retained a low-average cognitive capacity for understanding, remembering and carrying out instructions" and further found that Toro would have "some difficulty responding appropriately to work pressures."[74] Therefore, the ALJ fashioned the RFC to include "limitations against fast-paced work, strict production quotas and frequent work setting changes."[75]

The ALJ then examined the opinion of Robyn Hoffman, Ph.D., an agency reviewing psychologist.[76] In giving Dr. Hoffman's opinion "considerable weight," the ALJ observed that Dr. Hoffman had found that Toro had a moderate impairment in the domain of concentration, persistence and pace, but no more than a mild impairment in the domains of activities of daily life and social functioning.[77] The ALJ further noted that Dr. Hoffman had determined that Toro "retained the mental capacity to perform three - and four- step tasks without fast paced production quotas in settings where duties are relatively static and any changes can be explained."[78] The ALJ then particularly observed that this finding by Dr. Hoffman was consistent with Toro's "limited approach to mental health treatment" and

---

[74] *Id*. at 25 (citing record).

[75] *Id*.

[76] *Id.*

[77] *Id*. at 26 (citing record).

[78] *Id.*

reports of "good results therefrom,"[79] which conservative treatment record was extensively reviewed earlier in the opinion, and discussed here above.

Finally, the ALJ considered the various GAF scores in the record, noting first that such "snapshot ratings" from different sources outside of an ongoing treatment situation are of "limited utility" in determining "long-term mental functional capacity."[80] But, the ALJ concluded, these scores "taken together" "generally support a finding that [*Toro's*] *mental disorders have imposed significant limitations on her ability to perform basic work activities.*"[81]

As the above detailed presentation has shown, the ALJ addressed with great specificity every claim of mental limitation that Toro now asserts was ignored, and concluded not that this impairment produced no work-related limitations, but rather that "they imposed significant limitations" on her functional capacity. To the extent that the ALJ did not include greater restrictions, he fully explained his reasons in that regard in his finding on Toro's credibility, in his reliance on clearly identified portions of two functional capacity

---

[79] *Id.*

[80] *Id.* at 26-27.

[81] *Id.* at 27 (emphasis added).

opinions from state agency consultants,[82] together with reasons for why these elements deserved weight, and in his review of significance of the GAF scores.

Therefore, for the reasons stated, I find no error in the manner by which the ALJ considered Toro's impairments as a whole in formulating the RFC.

## Conclusion

Accordingly, and for the reasons stated above, I find that the decision of the Commissioner denying benefits to Maritza Toro is supported by substantial evidence, and the same is hereby affirmed.

IT IS SO ORDERED.

Dated: January 31, 2017              s/ William H. Baughman, Jr.
                                     United States Magistrate Judge

---

[82] *See*, SSR 96-6p (indicating that ALJs are "required" to consider opinions on the nature and severity of impairments offered by state agency consultants); *see also*, *Washington v. Comm'r of Soc. Sec.,* No. 1:13 CV 624, 2014 WL 2002988, at * 3 (N.D. Ohio May 14, 2014)(citation omitted)("it is not improper [in formulating the RFC] for the ALJ to rely upon the opinion of a non-examining state agency source, who is generally considered to be an expert in Social Security disability evaluations, and who are acknowledged to be useful to the ALJ in making sense of the whole record").